**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 09-cv-01657-WJM

SHAWN BALBAS SOUVA,

      Petitioner,

v.

PAMELA J. PLOUGHE, Warden of Territorial Correctional Facility, and
COLORADO ATTORNEY GENERAL,

      Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

Martínez, J.

      This matter is before the Court on the Application for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254 ("Application") (Doc. #1) filed on July 13, 2009, by

Petitioner Shawn Balbas Souva.  Petitioner Souva's Brief in Support of Petition for Writ

of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Brief in Support") (Doc. #4) was filed

on August 17, 2009.  On February 22, 2010, Respondents filed an Answer to

Application for Writ of Habeas Corpus ("Answer") (Doc. #26) and Petitioner Souva's

Reply to Answer to Application for Writ of Habeas Corpus ("Traverse") (Doc. #30) was

filed on March 23, 2010.  After reviewing the pertinent portions of the record in this case

including the Application, Brief in Support, Answer, Traverse, and the state court record

(Doc. #34), the Court concludes that the Application should be denied.

### I. BACKGROUND

      Following a jury trial in Adams County District Court case number 01CR71,

Petitioner was convicted of first degree murder after deliberation and he was sentenced to life in prison without the possibility of parole.  According to the Colorado Court of Appeals ("CCA") on direct appeal,

> [Petitioner] called 911 and reported that he and the victim had been attacked by an intruder in his apartment. [Petitioner] told the 911 dispatcher that the intruder hit him on the back of the head and he passed out.  He stated that when he woke up, his feet were shackled, and the attacker was beating the victim.  [Petitioner] stated that he escaped, but left the victim at the apartment and began to drive to the hospital.  [Petitioner] told the dispatcher that the incident had occurred a couple of hours earlier, but he had not notified the police because he had passed out in his car in a gas station parking lot on the way to the hospital.
>
> [Petitioner] gave the dispatcher the location of his apartment complex and stated that his apartment number was M-201.  However, several seconds later he told the dispatcher that his apartment number was actually N-201.
>
> Officers were dispatched to apartment M-201, but determined that it was vacant.  The dispatcher then told the officers that the apartment number was N-201, but when they checked that apartment, the officers discovered that it was inhabited by a couple who stated there had been no disturbance.  The officers returned to building M and decided to check with all the residents in the building to verify whether an assault was taking place as reported by [Petitioner].
>
> One officer checked the third floor and noticed a light on in apartment M-301, which was located directly above M-201.  He knocked on the door, but received no response. After determining that the door was unlocked, he notified the other officers, and they entered the apartment.
>
> The officers discovered the victim lying face down on the floor in a pool of blood.  Her hands had been taped behind her back and a chain was wrapped around her neck. There were shackles lying near her feet, and a spent bullet casing was lying on the floor.  The officers searched the apartment, but did not find any other victims or a suspect.

2

> One of the officers felt the victim's neck, but was unable to detect a pulse. The officer then called for a paramedic, who concluded that the victim was dead. The autopsy later revealed that the victim had died from a single gunshot wound to the head. Once the officers determined the victim was dead, they exited the apartment and did not reenter it until after they had obtained a search warrant.

(Doc. #1-1 at pp.3-5.)

The CCA affirmed the judgment of conviction. *See People v. Souva*, No. 02CA0741 (Colo. App. Oct. 6, 2005) (unpublished decision) (Doc. #1-1). On September 11, 2006, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari on direct appeal. (*See* Doc. #1-2).

On November 15, 2006, Petitioner filed a postconviction motion pursuant to Rule 35(c) of the Colorado Rules of Criminal Procedure. On November 21, 2006, the trial court denied the Rule 35(c) motion. (*See* Doc. #1-3). The trial court's order denying the Rule 35(c) motion was affirmed on appeal to the CCA. *See People v. Souva*, No. 07CA0123 (Colo. App. Mar. 13, 2008) (unpublished decision) (Doc. #1-4). On July 14, 2008, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari in the state court postconviction proceedings. (*See* Doc. #1-5).

Petitioner asserts four claims for relief in the Application, but only two of those claims remain to be considered. In the Brief in Support filed on August 17, 2009, Petitioner withdrew his claim that a jury instruction regarding involuntary intoxication violated his due process rights. (*See* Doc. #4 at p.1, n.1.) On September 1, 2009, Petitioner withdrew his ineffective assistance of counsel claim in Petitioner Souva's Notice of Withdrawal of Ineffective Assistance of Counsel Claim (Doc. #7). The Court notes that the parties list three claims, including the jury instruction claim, in their "Joint

Status Report" (Doc. #37) filed on February 23, 2011.  However, the Court will not consider the merits of the jury instruction claim because Petitioner previously withdrew that claim and Petitioner has not presented any legal argument in support of the jury instruction claim in the Application, the Brief in Support, the Traverse, or any other filing. In fact, Petitioner confirmed in the Traverse that he had withdrawn the jury instruction claim in the Brief in Support.  (*See* Doc. #30 at p.1, n.1.)

In the claims remaining to be considered, Petitioner first contends that his Fourth Amendment rights were violated as a result of the trial court's error in denying his motion to suppress evidence obtained pursuant to a warrantless search.  Petitioner's other remaining claim is that he was denied due process when the trial court erred in permitting introduction of specialized knowledge from Katie Wells without qualifying her as an expert witness.

## II.  STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim.  *Harrington v. Richter*,

131 S. Ct. 770, 784-85 (2011).  In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."  *Id.* at 784.  Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 784-85.  Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Id.* at 784.  In other words, the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated."  *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented."  *Id.* at 1178.  "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims."  *Id.*

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).  The threshold question the Court must answer under § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta,

of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Id*. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry

pursuant to § 2254(d)(1).  *See id*. at 1018.  If a clearly established rule of federal law is

implicated, the Court must determine whether the state court's decision was contrary to

or an unreasonable application of that clearly established rule of federal law.  *See*

*Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts.  *Id*. at 407-08.  Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

6

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry.  *See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable."  *Id.* at 411.  "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law."  *Maynard*, 468 F.3d at 671.  Furthermore,

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.  [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Richter*, 131 S. Ct. at 786 (internal quotation marks omitted).  The Court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.*

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254."  *Maynard*, 468 F.3d at 671; *see also Richter*, 131 S. Ct. at 786 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

As a condition for obtaining habeas corpus from a federal

7

court, a state prisoner must show that the state court's ruling
on the claim being presented in federal court was so lacking
in justification that there was an error well understood and
comprehended in existing law beyond any possibility for
fairminded disagreement.

*Richter*, 131 S. Ct. 786-87.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. §
2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section
2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state
court decision was based on an unreasonable determination of the facts in light of the
evidence presented to the state court. Pursuant to § 2254(e)(1), the Court must
presume that the state court's factual determinations are correct and Petitioner bears
the burden of rebutting the presumption by clear and convincing evidence. "The
standard is demanding but not insatiable . . . [because] '[d]eference does not by
definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

If a claim was not adjudicated on the merits in state court, and if the claim also is
not procedurally barred, the Court must review the claim *de novo* and the deferential
standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th
Cir. 2004).

## III.  ANALYSIS

A.  Illegal Search Claim

Petitioner claims that his Fourth Amendment rights were violated and that the
trial court erred in denying his motion to suppress evidence obtained in the search of his
apartment. Respondents argue that Petitioner's Fourth Amendment claim is not

8

cognizable in a federal habeas corpus action based on *Stone v. Powell*, 428 U.S. 465 (1976).  Under *Stone*, "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone*, 428 U.S. at 494 (footnotes omitted); *see also Miranda v. Cooper*, 967 F.2d 392, 401 (10th Cir. 1992).  A full and fair opportunity to litigate a Fourth Amendment claim in state court includes the procedural opportunity to litigate the claim as well as a full and fair evidentiary hearing.  *See Miranda*, 967 F.2d at 401.  A full and fair opportunity to litigate also "contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards."  *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978).

Petitioner specifically contends that he did not have a full and fair opportunity to litigate his Fourth Amendment claim because the Colorado courts failed to apply the correct constitutional standard.  On direct appeal, the CCA noted that the Fourth Amendment generally prohibits warrantless searches but found that, "[a]s pertinent here, the emergency aid exception applies when there is a colorable claim of an emergency threatening the life or safety of another."  (Doc. #1-1 at p.6 (internal quotation marks omitted).)  The CCA explained further that

> this exception "does not give police officers carte blanch[e] to make a warrantless entry whenever there is a theoretical possibility that another's life or safety is in danger."  Hebert, supra, 46 P.3d at 479.  Rather, there must be both an immediate crisis and the probability that assistance will be helpful.  The police must also have a reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.  Hebert, supra.

> Moreover, the police officer's primary purpose in conducting the search must be to render emergency assistance, not to search for evidence. Accordingly, the emergency search is strictly limited by the exigency arising from the emergency and does not support a general exploratory search. People v. Allison, 86 P.3d 421 (Colo. 2004).

(Doc. #1-1 at pp.6-7.)

Petitioner maintains that the CCA did not apply the correct constitutional standard because the Supreme Court requires more than a "colorable claim" that an emergency exists. According to Petitioner, the correct Fourth Amendment standards when Petitioner's conviction became final were articulated by the United States Supreme Court in *Brigham City v. Stuart*, 547 U.S. 398 (2006).

> It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed.2d 1068 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed.2d 639 (1980); some internal quotation marks omitted). Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L. Ed.2d 16 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed.2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 56 L. Ed.2d 486 (1978), to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40, 83 S. Ct. 1623, 10 L. Ed.2d 726 (1963) (plurality opinion), or to engage in "'hot pursuit'" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42, 43, 96 S. Ct. 2406, 49 L. Ed.2d 300 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."

10

> *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S. Ct. 2408,
> 57 L. Ed.2d 290 (1978).
>
> One exigency obviating the requirement of a warrant
> is the need to assist persons who are seriously injured or
> threatened with such injury.  "'The need to protect or
> preserve life or avoid serious injury is justification for what
> would be otherwise illegal absent an exigency or
> emergency.'"  *Id.*, at 392, 98 S. Ct. 2408 (quoting *Wayne v.
> United States*, 318 F.2d 205, 212 (C.A.D.C. 1963) (Burger,
> J.)); *see also Tyler*, *supra*, at 509, 98 S. Ct. 1942.
> Accordingly, law enforcement officers may enter a home
> without a warrant to render emergency assistance to an
> injured occupant or to protect an occupant from imminent
> injury.  *Mincey*, *supra*, at 392, 98 S. Ct. 2408; *see also
> Georgia v. Randolph*, *ante*, at 118, 126 S. Ct. 1515, 1525,
> 164 L. Ed.2d 208 ("[I]t would be silly to suggest that the
> police would commit a tort by entering . . . to determine
> whether violence (or threat of violence) has just occurred or
> is about to (or soon will) occur").

*Brigham City*, 547 U.S. at 403-04.  Thus, according to Petitioner, rather than requiring

only that there be a "colorable claim" that an emergency exists, "the correct standard

was that the circumstances of a situation made '*the needs of law enforcement so

compelling*' that a warrantless search was permitted to occur."  (Doc. #30 at p.5.)

The Court is not persuaded by Petitioner's arguments that the CCA failed to

apply the correct constitutional standard or that there is a fundamental difference

between the standard applied by the CCA and the standard articulated by the Supreme

Court in *Brigham City*.  The CCA explained that a colorable claim of an emergency is

more than "a theoretical possibility that another's life or safety is in danger" and that

"there must be both an immediate crisis and the probability that assistance will be

helpful."  (Doc. #1-1 at p.6.)  Based on the fact that the standard articulated by the CCA

requires the existence of an immediate crisis and the probability that assistance will be

helpful, the Court finds that the CCA made "at least colorable application of the correct Fourth Amendment constitutional standards." *Gamble*, 583 F.2d at 1165. Therefore, consideration of the merits of Petitioner's Fourth Amendment claim is barred by *Stone v. Powell* and that claim must be dismissed.

    B.  Due Process Claim

    Petitioner next claims that he was denied due process when the trial court erred in permitting introduction of specialized knowledge from Katie Wells without qualifying her as an expert witness. According to Petitioner, his "defense was that voluntary intoxication had made him unable to form the specific intent necessary to commit first-degree murder [and] Wells's testimony set the stage for refuting [Petitioner's] defense when it contradicted the testimony of several subsequent defense witnesses." (Doc. #4 at p.24.)

    Ms. Wells testified that Petitioner was one of her son's friends and that she had known Petitioner for five or six years. (State Court R., Vol. 17 at p.30.) Ms. Wells further testified that she spoke to Petitioner by telephone on the night of the murder and that Petitioner sounded like he was "clean," or "[o]ff of drugs," at that time. (*See id.* at pp.31-32.) The prosecution specifically asked Ms. Wells if she had any training in the area of drugs or in dealing with people who use drugs and she responded that she was a certified addictions counselor in Colorado. (*See id.* at p.32.) Thus, according to Petitioner,

>     In testifying as she did, Wells testified as an expert.
>     Wells stated that [Petitioner] was not intoxicated, a
>     conclusion reached only through conversations on the
>     telephone. Without actually seeing and interacting with
>     [Petitioner], it is clear that Wells relied upon her training in

> the field of addictions to determine that [Petitioner] was not
> intoxicated.  Aside from being an unreliable diagnosis made
> without even viewing [Petitioner], Wells' testimony was
> expert testimony that was not introduced as such, in violation
> of [Petitioner's] due process rights.  As a result, the
> prosecution was able to introduce expert testimony without
> going through the qualification process.  Further, the
> prosecution received the benefit of having the jury hear
> evidence accorded great weight, as that accorded expert
> testimony.  As evidenced by the fact that the jury convicted
> [Petitioner] of first degree murder, the non-expert testimony
> was obviously afforded greater weight by the jury than the
> evidence presented by his defense witnesses.

(Doc. #4 at p.24.)  On direct appeal, the CCA rejected Petitioner's claim challenging Ms.

Wells' testimony because her "testimony was lay opinion that was based on a matter of

common knowledge or experience, and therefore, it was not based on any technical

knowledge."  (Doc. #1-1 at p.18.)

"[I]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions.  In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Therefore, "[h]abeas

relief may not be granted on the basis of state court evidentiary rulings unless they

rendered the trial so fundamentally unfair that a denial of constitutional rights results."

*Mayes v. Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000); *see also Fox v. Ward*, 200 F.3d

1286, 1296-97 (10th Cir. 2000) (stating that, to justify habeas relief, a trial court's

evidentiary error must be "so grossly prejudicial that it fatally infected the trial and

denied the fundamental fairness that is the essence of due process").  It bears noting

that the Supreme Court has "defined the category of infractions that violate

'fundamental fairness' very narrowly."  *Dowling v. United States*, 493 U.S. 342, 352

13

(1990).

"[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks omitted).  The Court's "[i]nquiry into fundamental unfairness requires examination of the entire proceedings." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (per curiam).

Based on the Court's review of the state court record and the entire proceedings, the Court cannot conclude that admission of Ms. Wells' opinion that Petitioner was "clean" on the night of the murder rendered Petitioner's trial fundamentally unfair.  The primary issue in dispute at Petitioner's trial was whether he acted with specific intent and after deliberation such that he was guilty of first degree murder as opposed to second degree murder.  As a result, the closing arguments of both the prosecution and the defense focused on these elements and illustrate the testimony and evidence presented at trial with respect to these elements.

In their closing argument, the prosecution conceded that Petitioner had been using cocaine shortly before the murder but asserted that a number of other factors demonstrated he had acted with specific intent and after deliberation.

> But if you want to talk deliberation, if you want to talk intent, if you want to know for sure that he was clear in his mind then you look at what happened right before and you look at what happened right after.
>
> Yeah, we know he was coked up, we heard the testimony.  We know, it's a fact, the guy's got a problem. We know earlier in the evening that he was doing cocaine with Samantha.  She had no reason to lie about that, that's

what happened, fine, we accept that.

But what about the phone calls to Mary?  She was invited over.  You see, the people whose house she was at, they knew she was going to [Petitioner's] because he invited her, he lured her over to his apartment.  He knew what he was doing, he knew what he was thinking, oh, he knew how to use a telephone, right.

And when she got there she was jumped immediately.  We'll take it back a few steps further.  At what point can you say that cocaine wasn't affecting him when he didn't know what he was doing?  How about when he got the stun gun.

Do you think there's some dealer out there that's going to sell a stun gun to a 20-year-old who's acting whacked out on cocaine?  No.  And what about the gun?  It's hard for us to talk about because we never found it.

According to his story he had the stun gun for personal protection.  Where did the gun come from and why did he have it?  What happened immediately afterward?

Ladies and gentlemen, it couldn't have been two, three, four, five minutes after Mary was laying there dead that his mind was going crazy; that he made the first phone call to Katie Wells and came up with this incredible story about being jumped and telling people that's how the earring got ripped out of his ear because he knew that was the one thing that people were going to look at him and say, well, we know you were there for sure now right?

And then he calls back 10 minutes later because his mind was still working to tell her, Don't call the police.  Then he calls Samantha a whole bunch of times and pretends he's going to the hospital.

How about this one.  He goes to Damon Truglio's house where he sees Ryan Matson and Jennifer Grant, right; and, again, he's able to come up with the whole story.  You just heard Dr. Wingeleth testify that when somebody's so whacked out on cocaine they can get locked in their own house and yet [Petitioner] was able to drive from Westminster to the Denver Tech Center?  That's over 25 miles through Denver city streets.

15

No ticket, no accident, didn't get lost; and the stories go on. You heard the 911 tape. How clear, how clear was he in his mind when he first made that call? Because surely someone had to hear by now what happened because a gun was fired. But nobody heard it.

So when he's talking to the operator, Where do you live? I live in building M on Decatur Street, piece of cake. Then he asks her, Oh, by the way, has this been reported? And when she says no, you can hear it, um, Hello, I can't hear you, um, he starts stalling until he's able to come up with another kind of story.

Hey, N sounds like M. I probably shouldn't have called the cops in the first place. This will slow them down. The problem is there's the dispatcher. When she says M as in Mary he says N as in Nora.

Don't get me wrong, his story stinks, his story's crap. It's ultimately going to lead to his conviction; but it's a story nonetheless and it's a story that he's processing.

Now, I'm not going to belabor this point, but I want to say to you that if you make the decision that [Petitioner] is guilty of second degree murder because he was so whacked out on drugs that he didn't know what he was doing, you do it knowing in your heart that he was only under the influence to that degree for a very short time because we have proven, through all of the evidence and we have proven through all of the testimony that right before and right after he knew exactly what he was doing.

Ladies and gentlemen, [Petitioner] knew what he was doing when he killed Mary Rogers and that's murder. The fact that he planned it out and the fact that he deliberated between each and every tortuous step, that's murder one.

(State Court R., Vol. 18 at pp.56-60.)

During their closing, the defense emphasized the evidence and testimony from various witnesses that demonstrated Petitioner had used drugs on the day and night of the murder and that he was not acting rationally. (State Court R., Vol. 18 at pp.62-66,

16

67-68.)  Petitioner is correct that the prosecution made a point during their rebuttal closing argument that Ms. Wells, who counsels people with drug problems, believed Petitioner was "clean" when they spoke on the telephone shortly after the murder occurred and that her evaluation was "one of the indicators that he could form deliberation and he could form intent."  (State Court R., Vol. 18 at pp.76-77.)  However, that was only one of the indicators and it was not the focus of the prosecution's rebuttal closing argument.  Instead, the prosecution again emphasized Petitioner's actions before and after the murder to convince the jury that he acted with specific intent and after deliberation.

> Ladies and gentlemen, the People would ask you to think back to what the defendant said to Samantha Riley-Olsen when he went out to her car with her when Samantha was leaving, which was a little while before Mary Rogers met her death.
>
> He said to Samantha, Can I call you later?  And Samantha said to him, well, Shawn, you know the rules, you're not supposed to call my house and certainly not after 10:00 and really not at all.  He said, Well, can I call you if there is an emergency?  She said, Yeah, you can call me if there's an emergency.
>
> Pretty odd thing to say.  Who plans to have an emergency or who knows he's going to have an emergency?  Well, somebody who's going to kill someone knows that.  And who is one of the first people he calls?  Samantha Riley-Olsen.
>
> We know that from the phone records that he calls her actually at least twice, if not more, calls her at 10:36, calls her at 1:43, tells her about this, his story about the assault on him and Mary's being beaten.
>
> But in the meantime he says, Can I call you later if there's an emergency?  We know that at least that moment he's starting to deliberate.  He certainly doesn't seem like

somebody that's hallucinating.  When he's talking to Samantha he seems like somebody who knows what's going on around him, he's certainly aware what's going on around him.

Also, ladies and gentlemen, when you look at deliberation, when you look at intent look at how that apartment was when Mary Rogers walked in there.  You know from the evidence that the police officers told you and from the pictures they took that the furniture, the couch, the coffee table were pushed as far into the fireplace as they could be and that they weren't where they normally are, the indentations where they normally are, where he logically had them weren't there.

Why is that?  Because the defendant knew what he was going to do and he was giving himself more room to do that.  He knew there would be somewhat of a struggle and he was giving himself more room.  That's what he was doing.

Once again he's deliberating, he's preparing; and as Dr. Wingeleth says, that's one of the indicators that he could form the intent and he could deliberate; and he wasn't so high on cocaine that he couldn't be guilty of first degree murder.

. . .

And, also, not only did he do it but, ladies and gentlemen, more indication that he did so deliberately and with intent because either one of two things have been true.

Either, ladies and gentlemen, he had all this stuff ready, he had that piece of cable that was knotted at both ends, that's the way it looked, he had that ready before she came over, he had his shackles ready, he had his Taser ready, he had his tape ready, he had all this bizarre stuff ready before she came over.  And certainly that's deliberation.

Or even if he made up his mind, even if you find he made up his mind after she came in, he has to go around deliberating, he has to get out the wire, he has to get the shackles, and he has to get the Taser; and all the while he

has reasonable time to clean up, reflection and judgment.

It doesn't have to be good judgment, there's nothing in the law that says it has to be good judgment, just judgment. All the time he's getting this stuff he's able to deliberate and have reflection and stop but he didn't. He went ahead and he did it, he murdered Mary Rogers. The evidence clearly shows you that.

Plus more evidence that he did this, ladies and gentlemen, when he goes down to Damon Truglio's at about 12:30, he pretends to phone the police and he turns to them and says, Mary's dead, she's been shot, there's a murder investigation at my apartment.

Well, there was no murder investigation. We know that. The police weren't called until about 2:26 a.m. This was at about 12:30 or 1:00. But only the killer, only the defendant, the murder [sic] would know that she had been shot and was dead at that point. No one else knew that.

So clearly this evidence shows you his intent to commit this crime and clearly it shows you he's taking steps to cover himself up. This is only about 12:30 or 1:00. He's taking steps to cover himself up – or cover up what he's done rather.

You heard from Ryan Matson. Ryan Matson urged him to call the police; and the defendant, being urged to call the police, he said, Well, I better do that or I'm going to look pretty guilty. Then he intentionally, deliberately and intentionally, pretended to make that phone call.

So, yes, he's able to deliberate, he's able to show the intent. And also, ladies and gentlemen, what other evidence do you have that he was able to deliberate and form the intent?

Well, look at what he is doing right afterward, the minutes after murdering Mary Rogers, doing these things to her, wrapping her up in the chan, that cable, tape, and shooting her in the head.

He's able to deliberate and intends to pick up that phone and call Katie Wells. He's able to know he has to

> have a place to sleep; and he is able to say to her, to tell her this story about these people assaulting him and then they were beating up Mary.
>
> And he is deliberately and intentionally covering his tracks. The circumstances surrounding this murder show that he was able to form the deliberation and the intent.

(State Court R., Vol. 18 at pp.69-71, 73-75.)

The fact that the jury did not accept the defense argument regarding cocaine intoxication does not demonstrate that admission of Ms. Wells' testimony that she believed Petitioner was "clean" on the night of the murder rendered the proceedings fundamentally unfair. It was not grossly prejudicial to allow, as a lay opinion based on common knowledge and experience, testimony about Petitioner's condition from a witness who had known Petitioner for a number of years and who had spoken to Petitioner shortly after the murder. Although the prosecution referred to Ms. Wells' status as an addiction therapist and her opinion that Petitioner was "clean" during their rebuttal closing argument, the prosecution's case against Petitioner did not rely or depend on that opinion to such an extent that admission of that opinion rendered the proceedings fundamentally unfair. In fact, the prosecution conceded during closing arguments that Petitioner had been using cocaine and was "coked up" the evening of the murder. However, the prosecution's closing arguments quoted above also reflect accurately that a great deal of other testimony and evidence supported the jury's conclusion that Petitioner acted with intent and after deliberation. As a result, the Court finds that this claim also lacks merit and must be dismissed.

## IV. ORDERS

THEREFORE, IT IS ORDERED as follows:

1.  That the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §

2254 ("Application") (Doc. #1) filed on July 13, 2009, by Petitioner Shawn Balbas Souva

is DENIED;

2.  That this case is DISMISSED WITH PREJUDICE; and

3.  That there is no basis on which to issue a certificate of appealability pursuant

to 28 U.S.C. § 2253(c).

DATED this 4th day of March, 2011.

BY THE COURT:


s/ *William J. Martínez*
United States District Judge